Argued and submitted July 6, 2007, reversed April 16, 2008

In the Matter of J. S.,
A Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
K. S., and M. K.,
*Respondents,*

*v.*

J. S.,
*Appellant.*

Multnomah County Circuit Court
2002802763

Petition Number 21323

A134843

182 P3d 278

Karen S. Torry argued the cause and filed the brief for appellant.

Noel Snyder argued the cause and filed the brief for respondent K. S.

Caryanne Conner argued the cause and filed the brief for respondent M. K.

Judy Lucas, Assistant Attorney General, waived appearance for respondent Department of Human Services.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Baxter, Judge pro tempore.

BREWER, C. J.

**BREWER, C. J.**

Child appeals a judgment that dismissed, after trial, his petition for termination of mother's and father's parental rights. Child sought termination of parental rights on two grounds: (1) that mother and father are unfit by reason of conduct and conditions seriously detrimental to child, including mother's substance abuse and domestic violence between the parents, *see* ORS 419B.504, and (2) that mother and father are unfit by reason of extreme conduct toward other children, namely the previous involuntary termination of their parental rights to other children where conditions giving rise to the previous actions have not been ameliorated. *See* ORS 419B.502(6). On *de novo* review, ORS 419A.200(6)(b), we conclude that there is clear and convincing evidence that mother and father were presently unfit under ORS 419B.504 at the time of trial in this case, that it is unlikely that child can be integrated into parents' home within a reasonable time, and that termination is in child's best interests. Accordingly, we reverse.

As outlined below, mother and father have five children together and have been involved in two proceedings that led to the termination of their parental rights to their four oldest children. The first proceeding involved their children A and W and the second involved their children R and K. Because the conduct and conditions that made mother and father unfit as of the time of trial in this case are part of a long-term pattern, we begin by outlining mother's and father's history as it relates to their other children, the conditions and conduct that gave rise to the previous termination proceedings, and the services offered to and engaged in by both parents in those proceedings. We then examine the conduct and conditions that child contends make mother and father presently unfit to parent him, as well as the pertinent services offered to and engaged in by each parent during these proceedings.

Father was 48 at the time of trial in this case. He has six children. His oldest daughter is an adult, age 25 at the time of trial, who has a child of her own. There does not seem to be any dispute that father was an adequate parent for his

oldest child, who has a different mother and whom he largely raised as a single parent; he has a relationship with that child and with his grandchild. As explained below, father's five other children are his and mother's children.

Mother was 37 at the time of trial in this case. She began drinking at age 16 and began using methamphetamine at age 19, and she has a history of abusive relationships. Mother has eight children, none of whom live with her. Mother's oldest two children were born in 1988 and 1990. Mother believes that those children live with their father, and mother has not seen either of them in more than a decade. While they lived together, the father of those children subjected mother to daily abuse, including physical abuse.

Mother's third child, P, was born in 1997. The relationship between mother and P's father also involved violence: mother obtained a restraining order against P's father, and there was an altercation between them that resulted in P's father's arrest for violating the restraining order and mother being arrested for assault. For a time in 1999 and 2000, P lived with mother and father. In 2000, P was found to be within the jurisdiction of the juvenile court for reasons that included mother's history of substance abuse. At the time P was placed in foster care, he was speech-delayed. It is not clear from this record whether mother's rights to P were ultimately terminated; however, it appears that he lives with his father and that mother sees him regularly.

Mother's five other children are joint children with father. A was born in 1999 and tested positive for methamphetamine at birth. Mother admits that she used methamphetamine while pregnant with A. W was born in 2000 and also tested positive for methamphetamine at birth.

Around 1999, mother was frequently drinking heavily; father testified that she would drink to the point of blacking out "every weekend" and that frequently he would come home to find mother drunk and "wanting to fight." At some point in 1999 or 2000, father gave mother a choice between moving out and quitting drinking, at which time mother decreased her alcohol consumption to about one beer every month.

In September 1999, mother and father had a fight in front of P, then about age two, and A, then an infant, after mother had been drinking. Mother hit father in the face several times, pulled his hair, and threatened him with a knife and pruning shears; ultimately police were called and mother was arrested. In November 1999, mother and father had a fight after mother and her sister had been drinking heavily and using methamphetamine. P and A were again present during the fight. Mother pushed father, causing him to fall, and scratched his chest hard enough to leave marks; father grabbed both mother and her sister by the hair and pushed them out the door of the house. Police were again called, and father was arrested. In July 2000, when mother was pregnant with W, father and mother had a fight when mother wanted pain pills for a toothache and father objected because she was pregnant. Between two and four times, father hit mother on the buttocks and thigh hard enough to cause bruising. During the altercation, mother either hit father with an ashtray or threw it at him. Father was arrested as a result of the incident.

Dependency jurisdiction over A and W was established in September 2000. The juvenile court ordered both parents to participate in drug and alcohol services and parenting classes and to undergo psychological evaluations. Father was also ordered to engage in domestic violence intervention services.

DHS caseworker Goldbeck worked with mother and father from November 2000 through the middle of 2002. Goldbeck referred mother for alcohol and drug treatment services. Mother acknowledges that she agreed to participate in drug and alcohol treatment, but she did not participate in a drug and alcohol evaluation as Goldbeck requested; because there was no evaluation, there was no recommendation for treatment. Nor did mother participate in random urinalyses (UAs) offered through DHS. Mother did participate in DHS-requested intelligence testing in June 2001, scoring in the low average range.

DHS referred father to Men's Resource Center and to Transition Projects for domestic violence intervention and anger management services; father completed an intake with

Transition Projects in December 2000. There is conflicting evidence in the record about father's participation in classes with Transition Projects; we find that father, attended, at most, a few classes. Father participated in a drug and alcohol assessment sometime in 2000, but he did not return for scheduled UAs or complete the recommended course of treatment. Father testified that he was also ordered by the court to attend Al-Anon meetings, which he did for about eight months.

Father did not maintain good contact with DHS during the proceedings involving A and W; he did not have a phone number where he could be reached and did not follow through on his promises to contact DHS for information. Mother and father were not consistent in attending family decision meetings or other appointments with DHS; they were also erratic in their attendance at visits with the children. During the visits that he did attend, father interacted well with both children.

As noted, dependency jurisdiction for A and W was established in September 2000. Mother and father separated in October 2000 so that A and W could be placed with father. Under the safety plan in effect at that time, mother was allowed to come to father's home for scheduled visits with the children; after about a month, the safety plan was changed to require that all contact between mother and the children take place at the DHS office. In January 2001, A and W were removed from father's custody because DHS determined that mother was seeing the children when they were at father's home. Although father initially had planned not to reunite with mother until she had finished her court-ordered programs, he did reunite with her although she had not done so. Mother resumed living with father shortly after A and W were removed.

In November 2001, the juvenile court relieved DHS of its obligation to offer services to mother and father because mother and father had failed to follow through with their existing service plans. In 2002, mother's and father's parental rights to A and W were terminated after a trial in Clackamas County Circuit Court. The juvenile court found

mother to be unfit by reason of conduct and conditions seriously detrimental to A and W and unlikely to change, including mother's addictive or habitual use of intoxicating liquors or controlled substances to the extent that her parental ability had been substantially impaired and mother's failure to effect a lasting adjustment to her circumstances after reasonable efforts by social service agencies for such duration of time that it appeared that no lasting adjustment could be effected. The juvenile court also found that mother had neglected A and W. Father stipulated to some of the facts alleged in the termination petition, and the judgments terminating father's parental rights to A and W are labeled "stipulated judgment." In those judgments, the juvenile court found father to be unfit by reason of conduct or conditions seriously detrimental to A and W and unlikely to change; the sole conduct or condition was failure to present a viable plan for the return of A and W to father's care and custody. The juvenile court also found that father had neglected A and W.

R and K were born in 2002 and 2003, respectively; both tested positive for methamphetamine at birth. Mother did not have prenatal care when she was pregnant with either R or K. Mother admits that she used methamphetamine while pregnant with R. R had problems consistent with being drug-affected, including reflux, shaking, stiffness, extreme sensitivity, and screaming for hours.

After dependency jurisdiction was established over R and K, the juvenile court initially ordered mother to undergo a drug and alcohol assessment, to complete a parenting class, and to participate in visits with the children. The court contemplated that mother would have a psychological assessment and be referred to domestic violence or anger management services once she had made progress on drug and alcohol issues.

DHS caseworker Mancini worked with mother and father from June or July 2002 though September 2003. During that time, mother's contact with DHS was sporadic; Mancini had fewer than five direct interactions with mother, and mother's participation in services was limited. Throughout the time they worked together, mother told Mancini that she did not have a substance abuse problem and did not

understand why she needed treatment. DHS referred mother to the Family Involvement Team (FIT) program for drug and alcohol assessment, which mother did not complete until March 2003. The evaluator indicated that mother would benefit from intensive outpatient alcohol and drug treatment and might benefit from treatment for depression. Because mother did not follow through with DHS, Mancini did not make a referral for a psychological evaluation or for domestic violence or anger management services.

Father appears to have had more interaction with DHS during that time frame than mother did. The juvenile court ordered father to re-engage in domestic violence services, to participate in a parenting class, to have individual counseling, and to participate in visits with the children. Father admitted to Mancini that he had hit mother on the buttocks, but characterized this as trying to get mother's attention and stop her from doing what she was doing and not as domestic violence. DHS again referred father to Transition Projects and, according to Mancini, he "partially attend[ed]" programming there until that provider lost its funding. She then referred him to Men's Resource Center. Father participated in an intake in October 2002, during which he admitted that he had hit mother on the buttocks twice, restrained her several times, and yelled during conflicts. At that time, the program consisted of weekly two-hour group meetings for six months; father attended five meetings. Father's participation in those sessions was "fine": he was cooperative and positively acknowledged nonviolent goals, but in a somewhat superficial way; he also minimized the incident in which he hit mother in 1999. DHS did not make further referrals for domestic violence services after that because it did not appear that father would participate.

DHS referred father to Volunteers of America (VoA) for a parenting class, which father completed. DHS also referred father for psychological evaluations twice, once with Kowitch in May 2002 and once with Kolbell in October 2002. The first evaluation was based on incomplete testing because father did not return for follow-up appointments. Because Kolbell's evaluation was based on complete information and because he testified at trial, we focus on his evaluation; in

any event, the two evaluations do not differ markedly in their conclusions and recommendations.

Kolbell described father as having average intellectual function, although his general fund of information and, particularly, his knowledge of child development is "markedly lacking." He has "extremely poor" judgment, as evidenced by his maintaining a relationship with mother after several children were born drug-affected. Kolbell noted that father

> "seemed to have little appreciation for the potential effects of exposure to methamphetamine during pregnancy, dismissing it, suggesting at one point during the interview that—that had this been alcohol, no big deal would have been made.
>
> "* * * [H]e thought that there really wasn't any substance to the ideas that methamphetamine in particular produced physical or cognitive impairments in developing children."

According to Kolbell, father has difficulty accepting responsibility and tends to blame others for his problems; father idealizes himself and others, including mother.

In testing, father was unwilling to acknowledge any shortcomings, reflecting either extreme defensiveness or lack of insight; this made the results of testing unreliable and, accordingly, Kolbell offered only provisionally a diagnosis of personality disorder, not otherwise specified, with prominent narcissistic and paranoid features. Kolbell explained that that diagnosis, standing alone, did not mean that father could not successfully parent, but that it could be an impediment to parenting.

In Kolbell's opinion, father's prognosis for parenting R "is an extremely difficult question." Father's personality characteristics would not make parenting "impossible" for him, and his apparently successful experience raising his now-adult daughter as a single parent "suggests that he does have some fundamental abilities in this regard." Kolbell observed that father "has the intellectual capacity and the emotional capacity to understand the needs of kids, absolutely, and he seems to be able to demonstrate it behaviorally

as well." In addition, Kolbell noted father's attachment to R but questioned whether it would be enough, given that R was a drug-affected child who may have special needs:

"Regarding parenting a drug-affected child who may have special emotional/behavioral needs, [father's] attachment to his children may provide a good foundation of effective parenting; however, it is of utmost importance that [father] recognize and acknowledge his limits as a parent and deficits that can be remediated. He is so defensive and so markedly inclined to minimize any frailties, that I fear he will have great difficulty in acknowledging any limitations and accepting assistance. While attachment and love for a child, particularly one who may have special needs, is important, it appears insufficient in terms of providing optimal parenting."

Moreover, Kolbell thought that father could identify and protect a child from many potential dangers, but not more subtle dangers; in particular, Kolbell was troubled by father's inability to recognize mother as posing a risk to a child. Kolbell found father to be stable emotionally in the sense that "he is who he is and he wasn't likely to change."

During the period in which caseworker Mancini worked with mother, mother attended fewer than half of the scheduled visits with R. Mother stopped visiting R altogether in August 2002 and did not resume visits until several months after K was born in January 2003. Father also was not consistent in attending visits with R, attending fewer than two-thirds of the scheduled visits and not calling when he was unable to attend a visit. After September 2002, father's visits became very sporadic, and ultimately his visits were suspended because R had reflux problems that made it difficult for him to travel, which was not justified when father was not attending visits. Both parents appeared to Mancini to be very concerned about R's medical problems and were very attentive to him during their visits. After K was born, both parents regularly attended visits with him. Father testified that he broke up with mother for a time in 2002 in order to try to keep R in his custody.

In September 2003, mother's and father's parental rights to R and K were terminated after trial in Multnomah County. The juvenile court determined mother and father to

be unfit on two grounds: First, because their rights to other children had previously been terminated and the conditions giving rise to the previous action had not been ameliorated and, second, by reason of conduct and conditions seriously detrimental to R and K and unlikely to change, including mother's long history of addictive use of alcohol and controlled substances that seriously impaired her ability to provide care for her children; mother and father's history of domestic violence, which placed any child in their care at risk of physical and psychological harm; and mother's and father's demonstrated lack of effort to adjust their circumstances, conduct, and conditions to make return of R and K possible and failure to effect a lasting adjustment after reasonable efforts by social agencies for such duration of time that it appeared that no lasting adjustment could be effected. The juvenile court also found that allegations supporting termination for neglect had been proved but that an allegation of abandonment of R had not been proved.

J, the child who now seeks termination, was born on April 28, 2005, and was placed in protective custody on May 2, 2005; he has been in foster care since that time. Mother did not have any prenatal care when she was pregnant with child. However, father testified that mother took better care of herself during that pregnancy than during the others: she ate and slept more and took vitamins. Child was born five weeks prematurely and suffered respiratory problems for the first two weeks of his life. A critical dispute in this case concerns whether mother used methamphetamine while pregnant with child and, relatedly, whether child suffers adverse consequences from any such use. We discuss the competing evidence and make our findings on those points below. 219 Or App at 258.

Mother admits that methamphetamine has been a problem in her life and that it will always be a problem for her. Mother consistently testified that she last used methamphetamine in December 2003. She testified that she drinks alcohol approximately once a month. Father similarly testified that mother now drinks no more than a beer a month. According to father, mother has changed: previously she would drink heavily and, as a result, behave unpredictably—"[you] didn't know what was going to happen when you

walked in the door." Now, she no longer drinks and she no longer has mood swings; she cleans the house and "cooks all the time, when she didn't before in the beginning. More consistent with things, put it that way."

As noted, mother gave birth to child on April 28, 2005. On December 2, 2004, mother visited the emergency room because of vaginal bleeding. Mother had had two positive home pregnancy tests, one several months earlier and one two days earlier, but she also had had a negative pregnancy test between those two and some bleeding about six weeks before the emergency room visit; mother testified that she was not sure that she was pregnant until the emergency room visit. Dr. Lahti, the emergency room physician who treated mother, estimated that mother was 14 to 16 weeks pregnant at the time of the emergency room visit. Lahti asked mother about drug and alcohol use and wrote in his report, "She occasionally drinks alcohol, and she uses methamphetamine. Last use was today." Lahti explained that, because of how he writes his charts, that comment meant that mother indicated that she had used methamphetamine that day. The only physical sign that mother exhibited that was consistent with methamphetamine use was her mildly elevated heart rate, but Lahti observed that many things can cause a rapid heart rate. Both mother and father, who was present at the time, deny that mother reported recent methamphetamine use to Lahti. According to father, mother was explaining about her past use of methamphetamine and asking if the medical personnel would "turn her in" because of it.

Mother had a urinalysis as part of a drug and alcohol assessment in August 2005; the results were "dilute." Mother had a positive UA for methamphetamine on September 20, 2005. Mother had a negative UA on January 4, 2006. Mother did not appear for requested UAs on January 27, January 31, April 17, April 28, or April 26, 2006. DHS stopped trying to arrange UAs for mother in April 2006, two months before trial in this case began.

Father testified at trial in this case that he has never believed that he had an anger management or domestic violence problem, but he did admit that there had been verbal abuse early on in his relationship with mother. He further

testified that the only reason he participated in batterers' intervention in 2000 and 2001 and in anger management counseling in 2002 was because the court had ordered it and that he viewed himself as different from most of the other people in the program. On the other hand, father observed in connection with his participation in these services that "you benefit from everything."

There is no evidence in this record of physical violence between mother and father since 2000. On January 11, 2006, Valdez, a security officer working at the DHS office, observed an incident in which father glared at mother in a "scary manner," called her "fat ass" and "smart ass," and told her to shut her "fat mouth" and not to pull any of her "cutesy shit." According to Valdez, father's tone was not loud, but it was "stern and intimidating." Valdez testified that mother looked scared, did not say anything to father in response, and walked away from father. Valdez had seen mother and father in the DHS offices previously and thought that they were "very, very nice" and usually found their behavior to be pleasant. According to mother, father was upset on that day and the two of them had had a disagreement, but she denied that he called her names or "glared" at her or that she was frightened.

In this case, when jurisdiction was established over child in September 2005, the juvenile court ordered mother to immediately engage in assessment and treatment for methamphetamine abuse, including random UAs. Father was ordered to participate in either Al-Anon or counseling that would address appropriate roles for partners of substance-abusing parents. Both parents were ordered to undergo psychological evaluations and to participate in domestic violence counseling and couples counseling. Both parents were ordered to visit child consistently and to participate in medical appointments that allowed parent-child contact, to participate in educational opportunities about developmental effects on children caused by prenatal exposure to methamphetamine, and to demonstrate an understanding of those effects.

Although mother maintained that she had been "clean and sober" for a year, she indicated to DHS that she

was willing to complete drug and alcohol treatment. A DHS representative arranged an appointment for mother with FIT for drug and alcohol screening on May 13, 2005, but was not able to contact mother to tell her about the appointment.

On June 7, 2005, DHS referred mother to VoA for screening for drug and alcohol services; mother participated in a screening with VoA drug and alcohol specialist Tobey on June 9, 2005. Mother told Tobey that she used alcohol about once a month and reported her last alcohol use as one 24-ounce can of beer on June 7. Tobey recommended a drug and alcohol assessment with Change Point through the Matrix program, random UAs, and a referral to an outreach worker.

Mother participated in an initial orientation at Change Point on June 27, 2005, and an assessment appointment on August 29. During the assessment, mother reported that she last used methamphetamine on December 31, 2003, and her last alcohol use occurred on August 24, 2005. She also stated during the assessment that her use of methamphetamine had never been problematic. The assessment counselor noted that mother exhibited "some smugness and denial—not pronounced"; the counselor's diagnostic impression was methamphetamine dependence and alcohol dependence.

The Change Point assessment counselor assigned mother to the Matrix program, with an expected participation of three group sessions per week for four months. Because Change Point offers the Matrix program under a research grant, mother was offered the program free of charge. Between October 6 and December 1, 2005, mother attended 12 group sessions and had six unexcused absences. On December 17, 2005, mother was discharged from the program due to excessive absences beyond Matrix program policy limits.

Washam, the Change Point counselor who worked with the Matrix group in which mother participated, testified that mother felt that, because she had been abstinent since 2003 and had dealt with her methamphetamine problem in the past, methamphetamine was not as great a concern in her life. It appeared to Washam that mother's primary motivation for treatment was to get child back. However,

Washam also reported that mother was very active in the group sessions. Mother had three UAs while participating in the Matrix program. Two were negative for drugs. The third was dilute; as Washam explained, however, because of the particular results of that test, it was also considered to be negative. When mother was discharged from the program, Washam recommended that residential treatment would be the best option for mother.

Sometime after being terminated from the Matrix program, mother asked DHS for assistance in getting into another drug and alcohol treatment program. Tobey, the VoA drug and alcohol specialist, referred mother to DePaul Industries in January 2006. On January 9, Tobey helped mother schedule an appointment for an assessment with DePaul on January 13, but mother did not keep that appointment. Mother asked DHS for assistance again in April 2006, and Tobey again referred her to DePaul, but mother did not make an appointment or otherwise engage in services.

DHS also referred mother to VoA's parenting program. Mother completed one ten-class module of two modules of a parenting class in late 2005. Mother indicated that she believed she and father were already doing most of the things discussed in the parenting class, but nonetheless thought the information was helpful. Mother missed a few of the sessions of the first module and, as a consequence, her participation in the second module was put "on hold." Father was upset that mother did not finish the parenting program.

Udlock, the DHS caseworker assigned to this case from July 2005 through the time of trial, arranged for mother to have a psychological evaluation in February 2006. When Udlock told mother about the appointment, mother's "response was basically why should I go because I know [child]'s not coming home." Mother did not attend the appointment. DHS referred mother and father for couples counseling in November 2005. The assigned counselor tried to contact them and scheduled two appointments, but they did not participate in counseling.

Mother explained that she did not discuss her problems with methamphetamine with father until the beginning of 2003. Father always opposed her use of methamphetamine, and mother feared a negative reaction. Early on, when

father confronted mother about her drug use, mother would not respond; father admitted that he then should have asked for help. When mother did start to be more open with father about her struggles with methamphetamine, he encouraged her to be involved with treatment and was supportive of her efforts to stop using the drug. When mother was in the Matrix program in 2005, participants were encouraged to bring a family member on Tuesdays; mother attended four Tuesday sessions, and it appears that father attended two of those with her. Mother testified that, since father has participated in the Matrix program with her, he can talk with her more easily about her methamphetamine problem.

Father acknowledged that, as of four or five years before trial, he could not recognize when mother was on methamphetamine, and in fact he was shocked in 2000 and 2002 when W and R were born with methamphetamine in their systems, because it did not appear to him that mother was using at that time. More recently, however, he believed that he could tell when she was using, and he testified that he last saw mother under the influence of drugs in 2003. Although father was concerned in 2005 when child was born methamphetamine exposed, he was not concerned at the time of trial in 2006, because he felt mother was no longer using drugs. Father testified that, while she was pregnant with child and at the time of trial, mother no longer had the mood swings and problems finishing things that she exhibited when she was using methamphetamine. Father was around mother on a daily basis when she was pregnant and never noticed any signs that she appeared to be under the influence. Nor did father notice any signs that mother was under the influence around the time of her positive UA in September 2005. As noted, father was ordered to participate in domestic violence counseling. Father asserted to Pierce, the DHS caseworker who worked with mother and father from the time of the initial shelter hearing until jurisdiction was established, that there had been no domestic violence for a number of years. After the jurisdictional hearing in June 2005, Pierce referred father to Choices for a domestic violence or anger management assessment. Father missed his first assessment appointment at Choices. Father ultimately did participate in an intake at Choices, but he did not enroll in a

program. At trial, father testified that he did not believe that he had anger issues that needed to be addressed. He explained that he is very good at controlling himself and that "[t]here's no use being upset in the world. Life's too short."

Caseworker Udlock's first interaction with mother and father occurred during a visit with child; Udlock had been scheduled to meet with mother and father before the visit but was not informed when they arrived. When he went to the visit room, father was upset, speaking to Udlock in a "challenging" and "negative" tone; at one point father commented to Udlock that he was going to "check him out." Father also spoke about it being okay to be upset when other people push buttons. The conversation occurred in front of mother and child, who was about three months old at the time.

Pierce also talked with father about a drug and alcohol screening with FIT; again, although father denied having a drug or alcohol issue, father agreed to participate in an assessment. As also noted, father was ordered to participate in Al-Anon or a similar program. DHS referred father to VoA outreach to help him attend meetings; that referral was ultimately closed because father dropped out of contact. In October 2005, as a result of father's request during a family decision meeting, Tobey, the VoA drug and alcohol specialist, provided an outreach worker who visited father with a package of information about codependency groups like Narcotics Anonymous and Al-Anon. Father "thumbed through" the package; he did not read it "word for word." One of the resources described in that information was a support group in Eagle Creek; father attended that group about four times, but the group was disbanded because not enough people were attending. Father testified that he learned from that group more about how people react when they are using methamphetamine. In January 2006, Udlock gave father additional information about Portland-area 12-step programs. There is no evidence that father followed up on any of that information.

As he had with mother, Udlock scheduled father for a psychological evaluation with Kowitch in early 2006; father forgot to go to the appointment. Udlock explained that,

because father did not participate in either the domestic violence and anger management assessment or the psychological evaluation, DHS could not evaluate whether father needed anger management counseling. Although father testified that he did not participate in couples counseling with mother because Udlock told him that he could not attend until mother finished her other programs, we find more credible Udlock's testimony that mother and father did not follow through on a referral for couples counseling. 219 Or App at 245.

As noted, child was born on April 28, 2005. He was discharged from the hospital on May 13, and Pierce tried to set up an initial visit with parents at the DHS office for May 23. However, because parents did not contact Pierce to confirm that date, the visit was cancelled. Father nonetheless arrived at DHS for a visit on May 23. Although father was angry and frustrated to learn that the visit had been cancelled, Pierce testified that father was able to control his anger and express his frustration appropriately; the two talked and planned for a visit on May 25.

Visits between parents and child were scheduled for twice a week through June 2006. It appears that both parents regularly attended scheduled visits with child or called ahead when they needed to reschedule. Usually both parents attended visits; about a quarter of the time only one attended. Mother and father both engaged with child and played appropriately with him; on the couple of occasions when child had emotional upsets, they dealt with child well and were not distressed. Mother and father brought child presents, although some were a little advanced for child's age. Mother and father gave child a birthday party at the DHS office; they invited family and friends, brought presents, and had a cake for child.

Mother and father did miss at least one visit with child. On March 22, 2006, a hearing on the case was held in court. After the hearing and at the time when he knew mother and father had a scheduled visit with child, Udlock saw mother and father driving and noticed that they pulled into the parking lot of a bar. Udlock went to his office and arranged for child to be returned to his foster home, since he

"didn't know what condition" mother and father would be in for the visit. Udlock then went to the bar, where he saw mother and father sitting in front of a video game machine; neither one had a drink, and the bartender confirmed that neither one had ordered any alcohol. Udlock asked parents about the visit with child, and they told him that they had thought that it was cancelled because of the court hearing. Other than that missed visit, Udlock remembered only one other missed visit; mother missed a visit in August 2005, but she apologized and rescheduled the visit.

As noted, the juvenile court ordered mother and father to participate in those medical appointments of child's that allowed parent involvement. At a court hearing in November 2005, mother and father indicated that they wanted to be present during a medical procedure set for child the following day. Udlock arranged for mother and father to attend the visit, but neither did. Father explained that he worked late and could not make it; mother said that she was too depressed after the court hearing to attend.

Father had declared bankruptcy in 1999 or 2000 but, as of the time of trial, his only debt was $2,100 in back child support. When the trial began in June 2006, father had been employed by an electrical contractor for a month, earning $20 per hour. During trial proceedings in September 2006, father testified that he still held that job. However, on the last day of trial, father corrected that testimony and admitted that he had been laid off the week before the September court date. He explained that he was laid off because of lack of work and because he did not have a current electrician's license. According to father, his supervisor, Lane, told him that once he repassed the licensing test father would be able to come back to work; Lane also told him he might be able to give father some work around the shop so that father could earn money to take the test.

Lane testified that father was terminated for unre-liability, not for lack of work. According to Lane, father was not available for a 40-hour work week and in "many instances" would not show up for work, often without calling ahead. Lane had had a number of conversations with father

about his reliability before he terminated him. Lane confirmed that he had talked to father about passing the licensing exam, but only as a first step toward reemployment, not as the only prerequisite; he explained that, if father passed the exam, "I'd need to have a conversation with [father] and see if he could be reliable." Vavrovsky, who worked with father at several job sites, also testified about several incidents in which father was late to work or took a very long lunch break. Vavrovsky testified about an incident in which father became angry at him: On one occasion when father was late coming back from lunch and Vavrovsky called the office to find out if anyone knew where father was, Vavrosky was instructed to have father call in when he returned. After father returned and called in, he became angry with Vavrovsky, speaking loudly and cursing because he believed that Vavrovsky had spoken to management about father's reliability.

Father had had the same address, a house, for a year and eight months before trial. As of the time of trial, he lived there with one roommate. Father did repairs on the house, painting, and yard work in lieu of paying rent. Father did not know the last name of the person who owns the house, and it appeared that the owner might be selling the house sometime soon. The owner of the house was happy with the work father had done on it. When DHS caseworker Pierce visited the house on May 10, 2005, it seemed clean and appropriate for children.

Portland Police Officer Sparling testified that, between November 2004 and June 2005, she received several complaints about excessive activity at father's house at all hours, as well as complaints that it was a "drug house." She estimated that she had made contact with people at the house at least 20 times during that period and had arrested at least two people there for possession of methamphetamine. She never arrested anyone inside the house, only people leaving. There were numerous people—five or more—living in the house at any given time, as well as people in a trailer or two. In June 2005, Sparling changed shifts and no longer works in the area of father's house. Nonetheless, in August 2006, during the period of trial in this case, Sparling was called to father's house for an "assist on medical" because someone had cut herself.

According to father, before August 2005, he had been in the habit of letting friends and acquaintances "crash" overnight or for a few days at his house. Sometimes those people drank alcohol while they were at father's house, but he denied that they were using drugs. According to father, none of the people staying in the house was unsafe, but on one occasion he did have to call police to have someone removed from the property. Udlock visited father's house in April 2006 and did not observe that anyone else lived there.

Mother and father both testified that mother had moved out of father's residence about two or three months before trial began in June 2006. Father testified that the separation was mother's idea because "she decided to change her life" and, if it were up to him, they would still be together; he denied that they had separated only for purposes of the trial. According to father, since the separation, he and mother saw each other once or twice a week, often in connection with visiting child; mother had stayed overnight at his house several times, but there was no romantic relationship.

Father testified that, if child were returned to his custody, he would allow mother only supervised visits because he is concerned that otherwise mother might take child with her. Although father acknowledged that mother did not complete her "programs," in his opinion she does not need to: Father believed that mother is no longer using methamphetamine and has not used it since 2003. He also believed that she already was a good parent, based on his observation of mother's parenting with A and P.

Mother had just obtained a job managing an apartment building at the beginning of trial and expected to move into an apartment within a week. She also had been working with a friend cleaning and painting apartments for about four months and intended to continue with that work. Mother estimated that her total monthly income once she started the apartment manager job would be about $3,000 per month. Mother testified that, if child lived with her, he would be at home with her when she was managing apartments or in the day care facility that her friend uses when she was cleaning and painting apartments. Mother anticipated that father would have visits with child and help with child

support. Mother testified that both she and father would sit down and talk to child as their primary means of discipline, which was what they had done with other children in their lives.

Mother testified that child did not test positive for methamphetamine at birth. Although, as discussed below, there is evidence that child was exposed to methamphetamine prenatally, 219 Or App at 261, child did not offer any test results indicating that child had methamphetamine in his system at birth, and we do not understand counsel to argue that child was born methamphetamine positive.

As noted, child was born five weeks prematurely and suffered respiratory problems for the first two weeks of his life; however, there is no evidence in the record linking those issues to methamphetamine or alcohol use during pregnancy. Mother testified that she was not aware that child has been affected by her drug and alcohol use apart from being separated from her. Child has had a kidney infection while in foster care, but there is no evidence that this is related to any use of methamphetamine by mother while she was pregnant with child. The DHS worker who supervised mother and father's visits with child described child as "sweet." At the time of trial, child was not on any medications and did not have any conditions requiring ongoing medical intervention.

Child's pediatrician, Calcagno, saw child five times between May 18, 2005 and April 28, 2006, and was qualified as an expert on pediatrics. Calcagno testified that babies who have been exposed to methamphetamine prenatally typically exhibit excessive irritability, have difficulty feeding, are difficult to console, and have increased muscle tone; he further testified that those symptoms were noted in child's chart. Long-term effects from prenatal methamphetamine exposure are primarily learning related, including difficulty with attention span and processing and retention of information. Those kinds of effects could be displayed in a child of child's age as of the time of trial, or they could develop later. Alcohol-exposed babies tend to have decreased muscle tone, poor feeding, poor growth, and delayed learning and ongoing learning difficulties. Children who are exposed prenatally to methamphetamine and alcohol often need early educational

intervention, individual education plans, and extra tutoring. They tend to require higher than normal parental supervision and teaching.

Calcagno testified that child was diagnosed on his first visit on May 18, 2005, as having been exposed prenatally to drugs based on child's foster mother's report that the neonatal intensive care unit had provided that information on child's discharge. Calcagno explained that the diagnosis was based on history provided by the foster mother; the physical examination of child was "completely within normal ranges." Child was within normal weight and length limits, calmed easily, was alert, did not have a high-pitched cry, and had no apparent distress; Calcagno noted no muscle tone issues. During child's two-month visit, Calcagno again noticed no distress, but the foster mother reported that child was fussy and had a high-pitched cry. Also at that visit, because child had been diagnosed as drug-exposed, Calcagno suggested that child have early intervention physical therapy, but he did not know whether child ever had that therapy. At the one-year visit, Calcagno did not observe difficulty consoling, high muscle tone, or other symptoms consistent with drug exposure. Overall, Calcagno testified that, at each visit, child appeared to be healthy, with the exception of an ear infection, a condition not related to prenatal drug use. On the other hand, Calcagno noted that symptoms consistent with prenatal drug exposure could be ongoing at home without being manifested during office visits. In addition, Calcagno or someone else in his office diagnosed child with gastroesophageal reflux, a common symptom of drug exposure, and he was treated for that condition for about two months. Neither the foster mother nor any medical personnel from the neonatal intensive care unit testified.

As noted, Calcagno was qualified as an expert on pediatrics. As such, he responded to several hypothetical questions from child's attorney. Calcagno testified that he would be concerned about any parent's parenting ability when the parent had a pattern of drug use that had not been addressed through completed treatment; in particular, he would be concerned that the parent would continue to use drugs. Calcagno further testified that he would be concerned about whether the other parent could protect a child from a

drug-using parent where there was a history of inability to detect when the parent was using and when the nonusing parent had only skimmed through information on the effects of drugs and how to recognize drug use and had continued the relationship with the drug-using parent after a number of children had been born drug affected. Kolbell, the psychologist who administered father's psychological evaluation in 2002 and who was qualified as an expert at trial in this case, testified that prenatal methamphetamine exposure can produce lasting physical abnormalities and intellectual impairments; it also places children at higher risk of psychological and behavioral difficulties, including attention deficit disorder. Kolbell testified that understanding the effects of methamphetamine requires the kind of complex judgment and reasoning that father has difficulty with.

Kolbell was asked to consider a hypothetical (to him) 18-month-old child of the same parents who had been exposed to methamphetamine until mother was 14 to 16 weeks pregnant and discuss what concerns he would have about father parenting such a child. Kolbell responded that it was possible for such a child to be healthy and have normal development, but that exposure to "toxic effects during that window * * * places the child at risk."

As noted, when he evaluated father in 2002, Kolbell was particularly concerned about father's judgment about the risk that mother could pose to a child. When presented with a hypothetical new child of father and mother's who was exposed prenatally to methamphetamine, Kolbell testified:

> "[I]t seems to me that [father] at least has had information that this is a bad thing or that it could be a bad thing. And information that his interaction with [mother] around this can be a risk to children. And that it continues to raise questions for—raises concerns for me again about [father's] judgment in deciding to father children with somebody who is drug using or drug affected.
>
> "And the converse is that if he doesn't know that she's using drugs or drug affected, that causes concerns for me about the nature of their relationship, the communication, the honesty, and those sorts of things that I think also can pose a risk. We know that those things can pose a risk to effective and healthy development of a child."

Overall, Kolbell characterized father's prognosis for parenting a child like child here as "guarded." In reaching that prognosis, Kolbell emphasized the lack of change in father's attitudes and actions, particularly father's apparent continuing inability to recognize when mother is using drugs or is drug affected. In order to change his prognosis, Kolbell testified that he would need to see, among other things, objective measures of progress due to engagement in treatment such as Al-Anon and, if father were still in a relationship with mother, an explanation of how mother was able to stay drug free.

DHS caseworker Udlock testified that, when parents are using drugs and do not appreciate that drugs can get in the way of the ability to parent, a child is likely to be neglected, because the parents focus on other issues while the child's needs go unmet. In particular, the child will not have a stable environment free of substances that could harm the child through either direct contact, neglect by the substance-abusing parent, lack of recognition of a problem by the nonusing parent, or exposure to other users who may be in the child's environment. He expressed concern regarding child's history of reflux in this case and whether mother and father would seek medical attention for child if needed. He also expressed concern that father and mother might reunite, which could mean that child would be exposed to mother's drug use and to domestic violence between parents. Udlock acknowledged that it would be difficult to be specific about the risks to this child from prenatal exposure to methamphetamine, because the effects from exposure vary from child to child. He testified that potential risks include inattentiveness, hyperactivity, or continuing reflux issues.

Udlock also testified about how domestic violence between parents can affect a child. There is a risk that one parent can be incapacitated and become unable to parent. There also is a risk that the child may be physically injured during an incident between the parents. A child may also suffer mental health issues, such as diminished self-esteem, as a result of witnessing domestic violence.

DHS considers child to be adoptable, and it has located an adoptive placement for child where child has lived

since June 2006. Udlock explained that child was at an age where it was important that he develop attachment to a permanent caregiver.

As noted, through counsel, child sought termination of parental rights on either of two grounds. First, relying on ORS 419B.502, child asserts that he established that mother and father are "unfit by reason of a single or recurrent incident of extreme conduct"; child particularly relies on previous terminations of mother's and father's parental rights to other children, a factor that ORS 419B.502(6) directs courts to consider. Second, relying on ORS 419B.504, child asserts that he established that mother and father are "unfit by reason of conduct or condition seriously detrimental to the child * * * and [that] reintegration of the child * * * into the home of the * * * parents is improbable within a reasonable time due to conduct or conditions not likely to change." As also noted, the juvenile court dismissed child's petition. The court did not make credibility findings or explain why it concluded that child had not established grounds for termination of parental rights.

On appeal, child reasserts that he established grounds for termination of mother's and father's parental rights under ORS 419B.502 and ORS 419B.504. As explained below, we agree as to ORS 419B.504. Accordingly, we need not address whether child established grounds for termination under ORS 419B.502.

■ Under ORS 419B.500, a court may terminate parental rights if the court finds that it is in the child's best interest to do so, but only if the child or the state also establishes the existence of one or more statutory grounds for termination. *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 95, 149 P3d 1124 (2006). The specific bases for termination of parental rights are set out in ORS 419B.502 to 419B.508. As pertinent to our analysis, child relied on ORS 419B.504, which provides:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are *unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the*

*child * * * into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.* In determining such conduct or conditions, the court shall consider but is not limited to the following:

"(1)   Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.

"(2)   Conduct toward any child of an abusive, cruel or sexual nature.

"(3)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4)   Physical neglect of the child * * *.

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6)   Criminal conduct that impairs the parent's ability to provide adequate care for the child * * *."

(Emphasis added.)

ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must assess the parent's present fitness. A parent is unfit, such that termination may be warranted, if the parent has engaged in conduct or is characterized by a condition and that conduct or condition is seriously detrimental to the child. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P2d 490 (2001); *State ex rel Dept. of Human Services v. L. S.*, 211 Or App 221, 239, 154 P3d 148 (2007). Termination is permissible only if the parent is unfit under that standard at the time of the termination trial. *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 448, 134 P3d 940 (2006). Second, if the parent is unfit, the court must assess the likelihood that the child will be integrated into the parent's home; termination

may be warranted if it is improbable that the child will be integrated into the parent's home within a reasonable time because of conduct or conditions unlikely to change. The facts supporting termination must be proved by clear and convincing evidence; in other words, the court must find that the evidence establishes that the truth of the facts asserted is highly probable. ORS 419B.521(1); *Simmons*, 342 Or at 95; *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 79, 106 P3d 627 (2005).

■ With those principles in mind, we turn to the evidence relating to mother's unfitness. The parties primarily focus on mother's drug use. On *de novo* review, we find mother's testimony that she was no longer using methamphetamine while pregnant with child and as of the time of trial to be not credible. In particular, mother testified that she had last used methamphetamine in December 2003. However, in December 2004 when mother was pregnant with child, she reported to Lahti, the emergency room physician, that she "uses" methamphetamine and had used methamphetamine on the day of her visit to the emergency room. In addition, in September 2005 mother had a methamphetamine-positive UA. Although mother had four negative UAs between October 2005 and January 2006, she did not appear for any of the subsequent six UA appointments DHS scheduled for her between January 27 and April 26, 2006. Mother had no plausible explanation for the no shows; they constitute convincing evidence that mother continued to use methamphetamine up to two months before the trial in this case began in June 2006. Thus, we find that child established that it was highly probable that mother used methamphetamine when she was pregnant with child and continued to use methamphetamine as of the time of trial. *Cf. L. S.*, 211 Or at 240-41 (where the most recent evidence of the mother's methamphetamine use was from 18 months before trial, the mother could not be found unfit on the basis of habitual or addictive use of controlled substances).

Given those findings and mother's admission that she started using methamphetamine when she was 19, mother had been using methamphetamine for approximately 18 years at the time of trial. Mother has not meaningfully

engaged in drug treatment at any point during those 18 years.

During each of the three termination proceedings involving mother, DHS repeatedly offered her drug assessment and treatment services, but mother consistently failed to engage meaningfully in those or any other drug services. During the termination proceeding involving A and W, between November 2000 and mid-2002, mother failed to participate in a DHS-requested drug evaluation or in random UAs offered through DHS. During the termination proceeding involving R and K, between mid-2002 and September 2003, mother completed a drug assessment, but never followed up on the resulting recommendation for intensive outpatient drug treatment. Between September 2003, when the termination trial involving R and K was held, and May 2005, when child was born and taken into protective custody, DHS was not working with mother and, accordingly, did not offer her any services. Nor is there any evidence that mother independently sought drug treatment during that time.

During the course of this case, mother participated in offered services somewhat more than she had in the prior two cases. She underwent a VoA drug and alcohol screening in June 2005 and followed through with the resulting referral to Change Point. In late 2005, mother enrolled in the Matrix drug treatment program. During the time she was enrolled in that program, however, mother missed one-third of the sessions without offering an excuse, and she was ultimately discharged from the program for excessive absences. Moreover, the counselor who worked with mother in that program indicated that mother did not believe that methamphetamine was a great concern in her life and that mother's primary reason for participating was not to address her drug problem, but to get child back. After being terminated from the Matrix program, mother twice requested help from DHS in getting into a drug treatment program, but she did not follow through on the ensuing referrals. Accordingly, although mother's participation in drug services during this case was an improvement from her participation during the prior two cases, her engagement was far from sufficient to allow us to conclude that she has successfully treated her drug dependency. *Cf. State ex rel Dept. of Human Services v. A. M. P.*, 212

Or App 94, 105-07, 157 P3d 283 (2007) (evidence that, at time of trial, the mother had voluntarily begun participating in services including drug treatment and parenting classes and had had "numerous" negative UAs in three months before trial, *inter alia*, precluded unfitness determination).

Although mother stated at one point at trial that methamphetamine will always be a problem for her, that single piece of testimony is belied by numerous other statements and actions, as well as by mother's continuing use of methamphetamine. Mother's report to her Matrix counselor that methamphetamine was not a great concern in her life is consistent with mother's pattern of minimization of her drug use and the effects it has had on her children. Mother admitted that she had used methamphetamine since she was a teenager and that she used methamphetamine while she was pregnant with A and R. Four of mother's children tested positive for methamphetamine at birth; her parental rights to those children were terminated largely because of her substance abuse. On this record, there is evidence that three of mother's youngest six children suffer symptoms consistent with prenatal methamphetamine exposure: P was speech delayed; R experienced reflux, shaking, stiffness, extreme sensitivity, and excessive screaming; child in this case also has experienced reflux and was reported by his foster mother to be excessively fussy and have a high-pitched cry.

Even after her parental rights to A and W had been terminated—in large part because of her substance abuse problems—during the time that mother worked with DHS caseworker Mancini from mid-2002 through September 2003, mother maintained that she did not have a substance abuse problem and did not understand why she needed treatment. By mother's own admission, she was using methamphetamine during that period. In this case, mother stated during her Change Point assessment that her use of methamphetamine had *never* been problematic, and the counselor noted that mother exhibited some smugness and denial. Finally, mother believed that the only effect child in this case had suffered from her methamphetamine use was his separation from her. In sum, mother's persistent pattern of minimization and denial leads us to find that mother's limited participation in services in this case was not motivated by a

sincere appreciation of the gravity of her drug dependence and its effects on her children but, rather, was undertaken with the motive only to appear to be doing what was required to have child returned. *Cf. Simmons*, 342 Or at 99 (history of successfully treated drug use does not necessarily render parent unfit); *Stillman*, 333 Or at 148-49 (same).

In addition, we conclude that mother's continuing use of methamphetamine and her long-term unaddressed dependence on methamphetamine have substantially impaired and will continue to substantially impair mother's parenting skills so as to be seriously detrimental to child. First, there is persuasive evidence that child has already been affected by mother's use of methamphetamine while she was pregnant with him. As noted, mother admitted to Lahti that she had used methamphetamine the day she visited the emergency room; at that time she was 14 to 16 weeks pregnant. Although mother testified that she was not sure that she was pregnant until that emergency room visit, she previously had had two positive home pregnancy tests; in short, mother used methamphetamine while aware of a substantial possibility that she was pregnant. Mother's extremely poor judgment in using methamphetamine in December 2004 while aware that she might be pregnant is even more troubling in light of mother's knowledge that R suffered from physical problems related to her methamphetamine use during that pregnancy. There also is evidence, which we find highly probably to be true, that child suffers adverse physical symptoms consistent with prenatal exposure to methamphetamine; in light of that evidence and in light of mother's admission to Lahti, we conclude that child was exposed prenatally to methamphetamine to his present detriment.

■ Moreover, the detriment requirement "does not specify that the serious detriment must already have occurred as a prerequisite to termination. A condition or conduct can be deemed 'detrimental' based on potential harm even before that harm comes to pass." *State ex rel Dept. of Human Services v. J. A. C.*, 216 Or App 268, 279, 172 P3d 295 (2007) (some internal quotation marks omitted). In a case such as this, where there have been several previous terminations based on similar conduct and conditions, and where the instant child has been in state custody since birth, we must necessarily

focus in large part on the likelihood of future detriment should the child be returned to the parents. Child's pediatrician, Calcagno, testified that children exposed prenatally to methamphetamine may suffer long-term learning-related effects and often need early educational intervention, as well as higher than normal parental supervision and teaching. Psychologist Kolbell testified that prenatal methamphetamine exposure can produce long-term physical and mental impairment, as well as psychological and educational problems. Given that child already has suffered adverse symptoms from prenatal exposure to methamphetamine, we find it likely that he will continue to suffer from at least some symptoms of methamphetamine exposure on an ongoing basis.

Finally, mother's long-term and ongoing addictive use of methamphetamine has impaired, and is highly likely to continue to impair, her judgment and parenting ability with respect to child. Pediatrician Calcagno expressed concern about parenting ability in parents, like mother, with long-term untreated drug addiction, as did DHS worker Udlock, who noted that children in those circumstances can suffer neglect and lack of stability. In particular, Udlock emphasized child's history of gastsroesophageal reflux and his doubt that parents would recognize recurring symptoms or seek treatment for child. We find Udlock's concern in that regard to be well founded: Mother denies that child has suffered any adverse effects from prenatal drug exposure; she also failed to attend child's medical procedure after asking Udlock to arrange for her attendance. Combined with mother's poor judgment in using methamphetamine while pregnant with child after already seeing the effects of prenatal methamphetamine exposure on her older children, we conclude that child would suffer detriment from mother's lack of judgment and substantially impaired parenting skills. We conclude that mother is unfit by reason of conduct or condition seriously detrimental to child.

■ In addition, it is unlikely that child will be integrated into mother's home within a reasonable time. As noted, mother has had serious addictive problems with drug abuse since she was a teenager. DHS started offering mother services related to her abuse of methamphetamine in 2000 and

continued offering her services through April 2006, two months before trial began in this case. Although mother's participation in services improved slightly in this case when compared with her participation in the previous two proceedings, her participation in this case was still minimal. Moreover, mother denies current problems with methamphetamine and minimizes the adverse effects her addiction has had on her, her relationship with father, and her children. Given mother's long-term and consistent pattern of drug use and denial, together with prolonged unsuccessful efforts on the part of DHS to help mother engage in services, we conclude that it is unlikely that mother's conduct and conditions will change at all, let alone within a reasonable time such that child could be integrated into her home.

■ We turn now to the evidence relating to father's unfitness. Although it appears that father did subject mother to domestic violence, the record does not support a finding that father had problems with domestic violence as of the time of trial. Moreover, there is some evidence that, in 1999 or 2000, father tried to intervene with mother to address her abuse of alcohol, with some success. In addition, father historically has shown more willingness than mother to participate in assessments and services offered by DHS. However, father shows disturbingly little insight into mother's methamphetamine addiction and its effects, and we conclude that, were child to be integrated into father's home, there is a high probability that child would not be protected from drug use by mother and others, exposing child to continuing risk of harm. In addition, child is likely to need parenting skills that exceed father's capacity.

Although father testified at the trial in this case that, if child were returned to him, he would allow only supervised contact with mother, we do not find that testimony to be credible. As a general matter, father's credibility is substantially undermined by his false testimony in September 2006 that he still held the job he had held when trial began in June when, in fact, he had been terminated from that job a week previously. More particularly, although father and mother both testified that they were separated at the time of trial, we are skeptical of the permanence of that purported separation for several reasons. When father and

mother previously separated in 2001 and father expressed an intention not to reunite with mother until she finished participating in court-ordered programs, he instead reunited with her shortly after A and W were removed from his home, leading to an inference that that separation was a sham and for the purpose of keeping the children with him. In addition, after the separation before trial in this case, mother continued to stay overnight at father's house on occasion; moreover, father indicated that, if it were up to him, he and mother would still be together. In short, there is clear and convincing evidence that, if child were returned to father, he would allow child to have unsupervised contact with mother.

That conclusion is particularly troubling in light of the fact that father either fails to recognize or denies mother's methamphetamine abuse. Father argues that, although historically he could not recognize when mother was using methamphetamine, he had learned to do so by around 2003. Despite that assertion, however, father testified that he did not notice any signs that mother was using methamphetamine while she was pregnant with child in 2004 and 2005, nor when mother had a methamphetamine-positive UA later in 2005. There are two possible inferences from that testimony: either father has not in fact learned to recognize when mother is using methamphetamine or he is not being truthful about his knowledge of mother's continuing methamphetamine use. Accordingly, either father has failed to learn the first step in protecting child from mother when she is using or he chooses to cover up for mother instead of protecting child. In either case, it is clear that father cannot or will not protect child from mother.

In addition, we are concerned about Officer Sparling's testimony about the number of calls she received to father's property and related methamphetamine arrests. Again, although father testified that, by 2003, he had learned to recognize the signs of drug use, father denied that anyone in his home was using drugs. Father's denial supports the conclusion that either he is not in fact able to recognize signs of drug use or that he is willing to deny his association with drug users within his home. The last drug-related call Sparling received to father's property was about a year before trial, and so we do not rely on the presence of drug users in

father's home to support a determination of unfitness; rather, we view his ignorance, willful or otherwise, of having had drug users in his home as supporting the conclusion that father lacks either the skills or the motivation to protect child from exposure to drugs or drug abusers.

Moreover, father shows disturbingly little understanding of the effects of methamphetamine on children. Kolbell noted that father had little appreciation for the potential effects of methamphetamine use during pregnancy and was skeptical that prenatal methamphetamine use caused physical or cognitive impairments in children. Father also opined to Kolbell that, if mother had been using alcohol during pregnancy, it would have been "no big deal."

Father has been offered numerous services to help him recognize when mother is using methamphetamine, to learn skills for coping with a substance-dependent partner, and to understand the effects on children when parents abuse drugs. Starting in 2000, he attended Al-Anon meetings for eight months. In September 2005, father was ordered to participate in Al-Anon or counseling for partners of substance abusers. DHS made several referrals; father followed up in part on one, by attending a support group in Eagle Creek four times. Father also "thumbed through" a package of information about codependency groups. Father has, then, been offered the opportunity to learn about substance abuse and its effects and has not been able to apply that information to his own situation.

Psychologist Kolbell and pediatrician Calcagno both were concerned about father's ability to protect child from mother. In light of the information that had been made available to father, Kolbell was concerned about his lack of judgment in continuing to father children with someone who uses drugs. Calcagno expressed concern about father's parenting ability, given father's inability to recognize when mother was using, his failure to absorb information about the effects of drug use, and his poor judgment in continuing a relationship with mother after several children had been born drug affected. We agree that father's inability to comprehend and apply offered information about mother's drug use, and his

continuing relationship with mother in light of that information and the effects of mother's drug use on the older children, create a substantial likelihood that father will not protect child from known risks.

Moreover, given that child has already exhibited symptoms consistent with methamphetamine exposure, it is likely that he will exhibit additional symptoms as he develops, and it does not appear that father has the capacity to parent a child with special needs. As noted above, methamphetamine-exposed children often suffer long-term learning-related effects and require higher than normal parental supervision and teaching, as well as early educational intervention, education plans, and tutoring. Kolbell indicated that father's knowledge of child development generally is "markedly lacking" and that the more specific problem of understanding the effects of methamphetamine on children requires the kind of complex judgment and reasoning that is difficult for father. Kolbell further indicated that father is extremely defensive and inclined to minimize problems, such that it is unlikely that he would acknowledge that child has limitations and accept assistance. Finally, Kolbell noted that those features of father's personality were unlikely to change. Thus, father has limited ability to recognize and address special needs that this child is likely to develop. Kolbell's "guarded" prognosis for father's successful parenting ability did not change between 2002 and the time of trial in this case.

In addition, we conclude that father's inability to protect child from those risks has been and will continue to be seriously detrimental to child. For the reasons explained above in connection with mother, child was detrimentally affected by mother's use of methamphetamine while she was pregnant with child and is highly likely to continue to be detrimentally affected by mother's methamphetamine use; because father did not, and will not, protect child from mother's methamphetamine use, father's conduct is detrimental to child. The limitations on father's parenting skills are also likely to be detrimental to child; in particular there are substantial risks that father will fail to recognize child's developmental problems and seek appropriate help for them.

■       We also conclude that it is unlikely that child could be integrated into father's home within a reasonable time. The conduct and conditions making father unfit are part of a long-standing pattern that has already led to termination of parental rights to four other children. Over many years, father has failed to meaningfully acknowledge mother's methamphetamine use. Despite having several children born drug affected and despite several previous terminations, father persists in his relationship with mother. He is unable to engage with or learn from offered services, and fixed features of his personality impair the parenting skills he would need in connection with child. Accordingly, we conclude that it is unlikely that child will be integrated into father's home within a reasonable time.

■       Finally, we conclude that termination of mother's and father's parental rights is in child's best interest. Because of conduct and conditions that stretch back for more than a decade and that also harmed his four siblings, child was removed from his parents' custody at birth. Child is adoptable and has been living in an adoptive placement since June 2006. Child is at an age where it is important for him to develop attachment to a caregiver. Parental rights to child's siblings have been terminated, and so potential reunification of child with his siblings does not militate against termination. Given those factors, termination of mother's and father's parental rights is in child's best interest.

        Reversed.